

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Frantz Jerry Sainvil,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 16, 2016

Court of Appeals Case No.
82A05-1505-CR-345

Appeal from the Vanderburgh
Circuit Court

The Honorable David D. Kiely,
Judge

Trial Court Cause No.
82C01-1412-F3-5435

**Pyle, Judge.**

# Statement of the Case

Appellant/Defendant, Frantz Jerry Sainvil ("Sainvil"), appeals his convictions of, and sentences for, Level 4 felony possession of cocaine;[1] Class A misdemeanor possession of a controlled substance;[2] Class A misdemeanor possession of paraphernalia;[3] Class A misdemeanor resisting law enforcement;[4] and Class A misdemeanor possession of marijuana.[5]  On appeal, he argues that the prosecutor committed misconduct that amounted to fundamental error during his rebuttal closing argument by commenting on Sainvil's failure to testify.  In addition, Sainvil argues that his sentences were inappropriate under Indiana Appellate Rule 7(B) in light of the nature of his offenses and his character.  Because we conclude that Sainvil's prosecutorial misconduct argument is moot and that Sainvil's sentence was not inappropriate, we affirm the trial court's decision.

We affirm.

# Issues

1.  Whether the prosecutor improperly commented on Sainvil's failure to testify.

---

[1] IND. CODE § 35-48-4-6(a).

[2] I.C. § 35-48-4-7(a).

[3] I.C. § 35-48-4-8.3(a)(1).

[4] I.C. § 35-44.1-3-1(a)(3).

[5] I.C. § 35-48-4-11(a)(1).

2. Whether Sainvil's sentence was inappropriate.

# Facts

At 1:15 a.m. on December 23, 2014, Officers Todd Allan Mattingly ("Officer Mattingly") and Sarah Gibson ("Officer Gibson") with the Evansville Police Department were working the third shift motor patrol for the police department when they encountered a vehicle with an extremely dark window tint. Believing that the tint was dark enough to constitute a violation, the officers stopped the car and gathered the occupants' identifications ("IDs"). They discovered that Lidia White ("White") was driving the car, Michael Jackson ("Jackson") was sitting in the front passenger seat of the car, and Sainvil was sitting in a rear passenger seat of the car.

After taking the occupants' IDs, the officers told them to stay in their vehicle and then returned to their patrol car to check the IDs. When they got into the patrol car, however, Officer Mattingly saw the rear passenger door of the stopped vehicle open and Sainvil "stumble out into traffic." (Tr. 13). Sainvil then reached towards the waistband of his pants and "took off" running down the middle of the street. (Tr. 14).

Officer Mattingly pursued Sainvil on foot while Officer Gibson stayed within sight of the stopped car. During the pursuit, Officer Mattingly commanded Sainvil to "stop," but he did not do so. (Tr. 14). However, Sainvil fell while he was running, and Officer Mattingly began to catch up to him. When the officer was close enough to Sainvil, he deployed his taser twice, although both

deployments were unsuccessful. Officer Mattingly then deployed the taser a third time, and that time successfully hit Sainvil, who dropped to the ground. As Sainvil fell, he drew his arms in and "started to dig at his [waistband]." (Tr. 17). Officer Mattingly struggled to get Sainvil into handcuffs, and during this struggle, he saw Sainvil "[fling] his right arm out from the side of him[.]" (Tr. 18). "[S]everal bags and what appeared to be a cell phone [flew] off to the right side[.]" (Tr. 18).

[6] Soon thereafter, other police officers arrived at the scene. Officer Mattingly was then able to leave Sainvil to retrieve the items that Sainvil had flung to the ground. These items included bags with twenty-seven grams of "an off white rock[-]like substance" that eventually tested positive for cocaine, as well as 13½ white oblong pills that Indiana Poison Control later identified as hydrocodone mixed with acetaminophen. (Tr. 19). Officer Mattingly also searched Sainvil and retrieved a bag containing a green leafy substance that was later identified as marijuana, a glass pipe, and a drug ledger. During this search, Officer Mattingly observed that Sainvil "appear[ed] to be intoxicated." (Tr. 24).

[7] While the officers were still at the scene, Sainvil lost consciousness. The officers tried several different techniques to wake him up, including a sternum rub and the application of cuticle pressure, but none of the techniques worked. Eventually, they transported him to a hospital. In the meantime, Officer Mattingly instructed officers to search along the path that Sainvil had taken to flee the officers. He believed that there was a high probability that Sainvil had discarded a firearm somewhere based on a recent spike in gun violence in the

area, the amount of narcotics he had found on Sainvil, and the amount of money other officers had found on Jackson. The officers searched Sainvil's path and found a gun within five feet of the location where Sainvil had first fallen. That location was twenty-five to thirty feet from the spot where Officer Mattingly had eventually detained Sainvil.

[8] On December 29, 2014, the State charged Sainvil with Count 1, Level 3 felony possession of cocaine; Count 2, Level 5 felony carrying a handgun without a license; Count 3, Level 5 felony possession of a narcotic drug; Count 4, Class A misdemeanor possession of paraphernalia; Count 5, Class A misdemeanor resisting law enforcement; and Count 6, Class A misdemeanor possession of marijuana. The State then added an habitual offender enhancement for Counts 1, 2, and 3 on February 13, 2013.[6]

[9] The trial court held a jury trial on March 9 and 10, 2015.[7] At trial, the issue of whether Sainvil owned the gun that was found at the scene was extensively contested. Sainvil's defense theory was that someone else owned the gun and had previously dropped or placed it in the empty lot before his arrest. Officer Mattingly testified and admitted that he had not, at any point, seen Sainvil carrying a gun, although he said that Sainvil's movements towards his waistband had raised his suspicions that Sainvil had possessed one. Officer

---

[6] I.C. § 35-50-2-8.

[7] On the first day of trial, the State amended the habitual offender enhancement over Sainvil's objection to correct the date of one of his previous convictions. The State also amended Count 3 to a Level 6 felony.

Gibson also testified that she had not seen Sainvil with a gun. However, she said that she had not seen anyone else around that evening in the area where the gun had been discovered.

[10] Officer James Delano ("Officer Delano"), the officer with the Evansville Police Department who had found the gun, also testified. He stated that he had originally seen the firearm "on top of a pile of leaves." (Tr. 113). The State introduced a photograph of the scene taken by an officer with the police department's crime scene unit and asked Officer Delano, "Officer, in this picture to me it appears that there is a leaf or two on top of the gun[.] [H]ow did it appear when you found it first?" (Tr. 114). Officer Delano then restated, "Whenever I first found it[,] it was on top of the leaves[.] [T]here [were] no leaves that I could see on it[.] I could see pretty much the whole gun." (Tr. 115). He also said that in the area where he had found the gun, it "looked like someone had either slid or [fallen]." (Tr. 117).

[11] At the conclusion of the evidence, the parties presented their closing arguments. Sainvil's counsel argued that the State had not proved that the gun belonged to Sainvil. Instead, she asserted that it was possible someone else had previously placed or dropped the gun there. In support of this theory, she focused on the facts that Sainvil's fingerprints had not been found on the gun, the officers had not seen Sainvil with a gun, and no one could prove how long the gun had been on the ground prior to its discovery. She asserted that the gun's location—an empty lot—would have been "a great place" for other residents of the town "to dump a weapon for a variety of reasons," (Tr. 184), and she told the jury to

"look at the photo of [the gun]" and observe that "it [was] covered" with leaves. (Tr. 188). She argued that Sainvil would not have had time to conceal the weapon under those leaves as he fell, so the gun must have already been there. With respect to Officer Delano's testimony that the gun had not been covered with leaves when he found it, she asserted:

> I'm sure that [Officer Delano] heartedly believes, oh when I found that gun it was, it was completely uncovered[.] [M]aybe that's his memory of it, but that's not what the evidence suggests. We asked several of the officers what the conditions were, [and] not one of them said it was windy[.] [T]hey said it was wet, it was cold, but nobody said anything about it being windy. Well[,] if none of the officers can testify that they actually saw Mr. Sainvil trying to cover up or obscure an item on the ground, and if none of the officers can testify that it was windy, how did all of those leaves cover it up[?] [H]ow did all of those leaves get on that gun[?] [H]ow did all of that mud get all over that gun[?] You know, it didn't happen if it was just dropped suddenly and moments before[.] [T]he gun was already there.

(Tr. 189-90).

[12]  In response, the prosecutor argued in his rebuttal closing argument:

> Officer Delano searched it, and the only testimony you have about the presence of that gun on the closest time period from . . . when the defendant fell on the gun was Officer Delano saying, ["]that leave [sic] wasn't there[.] I could see it pretty easily[.] [T]hat's the only evidence you have.

(Tr. 197). Sainvil did not object to the prosecutor's argument.

[13] Subsequently, the jury found Sainvil guilty of the lesser-included offense of Level 4 felony possession of cocaine on Count 1; not guilty of Count 2; guilty of the lesser-included offense of Class A misdemeanor possession of a controlled substance on Count 3; and guilty of Counts 4 through 6. The trial court sentenced Sainvil to twelve (12) years for Count 1; one (1) year each for Counts 3, 4, and 5; and 180 days for Count 6. The trial court enhanced Count 1 by eight (8) years because Sainvil had pled guilty to being an habitual offender. The court also ordered the sentences to run concurrently, for a total sentence of twenty (20) years executed at the Department of Correction. Sainvil now appeals.

# Decision

[14] On appeal, Sainvil raises two issues: (1) whether the prosecutor committed misconduct amounting to a fundamental error when he stated in his rebuttal closing argument that Officer Delano's testimony was the only evidence regarding the placement of the leaves on the gun; and (2) whether his sentence was inappropriate under Indiana Appellate Rule 7(B) in light of the nature of his offense and his character. We will address each of these issues in turn.

## 1. Prosecutorial Misconduct

[15] Sainvil's defense theory at trial was that the gun discovered by police belonged to someone else who had placed or abandoned the gun in the lot prior to Sainvil's arrest. In support of this theory, his counsel noted during closing argument that the State's crime scene photograph of the gun depicted the gun

covered in leaves as if it had previously been concealed. The prosecutor disputed this contention in his rebuttal closing argument, stating:

> Officer Delano searched it, and the only testimony you have about the presence of that gun on the closest time period from . . . when the defendant fell on the gun was Officer Delano saying, ["]that leave [sic] wasn't there[.] I could see it pretty easily[.] [T]hat's the only evidence you have.

(Tr. 197).

[16] Sainvil now asserts that this argument constituted prosecutorial misconduct because it highlighted the lack of testimony, other than Officer Delano's testimony, regarding whether there were leaves on top of the gun. Because the issue of whether there were leaves on the gun related to whether Sainvil owned the gun, Sainvil claims that he is the only person that could have testified to contradict Officer Delano by stating that he did not own the gun. Therefore, he argues that the prosecutor's statement was a comment on his failure to testify. As prosecutors are prohibited from making such comments under the Fifth Amendment to the United States Constitution, Sainvil contends that the prosecutor committed misconduct and that his convictions should be reversed. *See Rowley v. State*, 285 N.E.2d 646, 648 (Ind. 1972) (holding that the Fifth Amendment prohibits a prosecutor from commenting on a defendant's failure to testify).

[17] However, we conclude that Sainvil's argument is moot. In *Breedlove v. State*, 20 N.E.3d 172, 174 (Ind. Ct. App. 2014) (quoting *Jones v. State*, 847 N.E.2d 190,

200 (Ind. Ct. App. 2006) (internal citations and quotations omitted), *trans. denied*), *trans. denied*, we stated the following standard for determining when an issue is moot:

> Where the principal questions at issue cease to be of real controversy between the parties, the errors assigned become moot questions and this court will not retain jurisdiction to decide them. Stated differently, when we are unable to provide effective relief upon an issue, the issue is deemed moot, and we will not reverse the trial court's determination where absolutely no change in the status quo will result.

[18] Here, Sainvil argues that the prosecutor improperly commented on his failure to testify regarding his ownership of the gun, and he requests that we reverse his convictions. However, the jury did not find Sainvil guilty of his charge of felony carrying a handgun without a license. Accordingly, we cannot provide "effective relief" to Sainvil because he was never convicted of the charge that the prosecutor's statement concerned. Therefore, we determine that Sainvil's argument is moot.[8]

[19] Although we do not usually review moot issues, "Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of 'great public interest.'" *Id.*

---

[8] Sainvil acknowledges that he was acquitted of carrying a handgun without a license, but he suggests that the prosecutor's statement prejudiced the jury against him with regard to his other charges. However, we are not persuaded by this argument because the prosecutor's statement did not implicate Sainvil's other charges and was not a direct comment on his failure to testify.

"'Cases in this category typically raise important policy concerns and present issues that are likely to recur.'" *Id.* (quoting *Mosley v. State*, 908 N.E.2d 599, 603 (Ind. 2009)). This case does not present an important policy question, so we will not review Sainvil's argument on the merits. *Id.* (finding that an appeal merely reviewing an alleged error did not present an important policy question).

## 2. Appellate Rule 7(B)

[20] Next, Sainvil argues that his sentence was inappropriate under Appellate Rule 7(B) based on the nature of his offense and his character. He claims that he received the maximum sentence for each of his convictions. He also argues that the nature of his sentence did not warrant the maximum because his offenses were non-violent and because the jury rejected the State's argument that he had possessed a gun during his offenses. Further, Sainvil asserts that his sentences were inappropriate in light of his character because, even though he had a criminal history, he had never been convicted of a violent crime, and all of his offenses were the result of his substance abuse problems.

[21] While sentencing decisions rest within the sound discretion of the trial court, a reviewing court may revise a sentence pursuant to Appellate Rule 7(B) if, "after due consideration of the trial court's decision," it finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender. *Childress v. State*, 848 N.E.2d 1073, 1079-80 (Ind. 2006) (quoting Ind. App. R. 7(B)). This Court is not required to use "great restraint," but we nevertheless exercise deference to a trial court's sentencing decision, both because Appellate Rule 7(b) requires that we give "due consideration" to that

decision and because we recognize the unique perspective a trial court has when making decisions. *Stewart v. State*, 866 N.E.2d 858, 865-66 (Ind. Ct. App. 2007). The "principal role of appellate review should be to attempt to leaven the outliers and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).

[22] Sainvil was convicted of a Level 4 felony, being an habitual offender, and four Class A misdemeanors.[9] He was sentenced to twelve (12) years for his Level 4 felony conviction, which was enhanced by eight (8) years for his conviction for being an habitual offender. The trial court then sentenced him to one (1) year each for three of his Class A misdemeanor convictions and to 180 days for his fourth Class A misdemeanor conviction. The sentencing range for a Level 4 felony is two (2) to twelve (12) years, with an advisory sentence of six (6) years. I.C. § 35-50-2-5.5. The sentencing range for a habitual offender conviction is between six (6) and twenty (20) years. I.C. § 35-50-2-8(i)(1). Finally, a person convicted of a Class A misdemeanor "shall be imprisoned for a fixed term of not more than one (1) year." I.C. § 35-50-3-2. Accordingly, the trial court did not, as Sainvil claims, sentence him to the maximum possible sentence for each of his convictions. His sentence enhancement for his habitual offender

---

[9] Sainvil claims that Count 6 was a Class B misdemeanor, but the record reflects that this conviction was enhanced to a Class A misdemeanor.

conviction was twelve (12) years less than the maximum, and his sentence for one of his Class A misdemeanor convictions was 180 days, rather than a full year as allowed by INDIANA CODE § 35-50-3-2.

[23] Moreover, we do not find that Sainvil's sentences were inappropriate. With respect to the nature of his offense, Sainvil asserts that his sentences should have been lower because his actions were non-violent and because the jury determined that he did not possess a gun when he fled the police. We acknowledge that the nature of Sainvil's offense was not horrendous, but he did attempt to flee police officers by leading them through the middle of a traveled street, and he also attempted to discard and hide the drugs he was carrying.

[24] Regardless of the nature of his offense, however, we conclude that his sentence was not inappropriate based on his character. Sainvil has multiple prior convictions for the same types of offenses he was convicted of here. In 2000, Sainvil was convicted of Class D felony possession of cocaine. His sentence was suspended to the Drug Abuse Probation Service Program, but his probation in that cause was "closed unsatisfactorily." (Sentencing Tr. 16). In 2002, Sainvil was convicted of Class D felony dealing in cocaine, and he was again enrolled in Drug Abuse Probation Services. His probation in that cause was also revoked. In 2007, Sainvil was convicted of purchasing a controlled substance in Georgia. Subsequently, in 2010, Sainvil was convicted of Class C felony possession of cocaine and was given the opportunity to be on the Forensic Diversion Program. However, he was revoked from that program. Finally, in 2013, Sainvil was convicted of two counts of Class D felony

possession of a narcotic drug and two counts of Class A misdemeanor resisting law enforcement. In addition, between 2000 and 2014, Sainvil was convicted of multiple misdemeanor offenses, including Class A misdemeanor driving while suspended with a prior conviction within ten years; Class B misdemeanor visiting a common nuisance; and Class A misdemeanor resisting law enforcement.

[25] Sainvil argues that the trial court should have considered the fact that, although he had a prior criminal history, most of his offenses resulted from his substance abuse problems. However, Sainvil has previously been granted the leniency he now requests, and such leniency has not reformed his behavior. Instead, he has continued to repeatedly purchase, possess, and deal drugs, as well as resist arrest. All of these actions show a disrespect for the law that does not reflect well on his character. Although, as Sainvil argues, substance abuse problems may at times mitigate evidence of repeated drug convictions, that is not always the case. *See Hape v. State*, 903 N.E.2d 977, 1002 (Ind. Ct. App. 2009) (holding that, where a defendant is aware of a substance abuse problem but has not taken appropriate steps to treat it, the sentence did not warrant a reduction), *trans. denied*.

[26] Based on the facts that Sainvil's criminal career has spanned sixteen years; that the trial court has shown him leniency multiple times, with unsuccessful results; and that Sainvil's offenses demonstrate a lack of respect for the law, we conclude that his sentence was not inappropriate in light of the nature of his offense and his character.

Affirmed.

Baker, J., and Bradford, J., concur.